And at this time we'll hear cooling water versus the EPA. I think we're ready. Good morning. Good morning, Your Honor. May it please the Court, my name is Christy Bullitt and I'm arguing today on behalf of all four industry petitioners in this case. Our argument today is going to focus on the service's deeply flawed assessment of the rule for existing facilities and the unlawful 11th hour changes that EPA made without notice and comment in order to satisfy the service's view of the effects of the rule and to complete formal consultation. The changes EPA made were not only procedurally defective, they exceed EPA's authority under 316B of the Clean Water Act and as well as the Clean Water Act writ large. If the Court has any questions at all about any of the other issues that industry petitioners raised, I'm happy to answer them or to call on counsel for API and the coalition for assistance. EPA may have issued the 316B rule under review, but EPA did not include the provisions that are even authorized under 316B. EPA has never claimed that 316B establishes a plan or regime for federal management or operation of cooling water withdrawals. It's not what 316B says. It's not how EPA characterized its action. Instead, EPA said to the services in 2012 when they sought to initiate informal consultation that the agency was establishing national technology-based standards that would set a federal floor for fish protection technologies for cooling water intake structures. That's all the agency action is. If the agency had not taken that action, then under the Clean Water Act, states would continue to make best professional judgment and federal agencies would continue to make decisions about what 316B requires on a case-by-case, best professional judgment basis using the authority that the Clean Water Act commits to them. Services that EPA the provisions that EPA inserted at the end of the process, after the comment period had closed, it inserted entirely at the behest of the services and in reliance on a biological opinion that the services produced. And the services insisted that those provisions be added based on its own analysis of the effects of EPA's proposal. That — Do EPA have discretion to reject the analysis provided by the services? EPA could have gone forward with a different rule. But as the Supreme Court has recognized, the services have — the services' ability to issue a jeopardy opinion has a powerful coercive force on any agency. So the — and — and this agency was under pressure to complete a rule and to get it out on time under a court order. So while, in theory, EPA could have simply ignored the services, they — the agency would have done that at its own jeopardy. What jeopardy? Pardon me? What do you mean at its own jeopardy? If — if it had gone forward — Somebody would come in and take them out in shackles? No, Your Honor. They wouldn't take them out in shackles. However, the agency would be aware that if the — if the services, based on that defective analysis, had issued a biological opinion that said that the agency's rule would cause jeopardy — Yes. Then the — that — then the agency could be accused of having violated the Endangered Species Act. Okay. But you just told me, in answer to my question, it had discretion to say no. It had discretion to decline to adopt the rule that — that the service — it had to — it had discretion, you are correct, to refuse to insert the — the provisions that the services foisted upon them. Well, it was decided based on its own view of the biological opinion provided by the services to — to adopt that view. Based on the information that is in the record, the agencies never agreed that the effect of the rule was what the services said it was. Their statement in initiating formal consultation — remember that each agency is authoritative in its own bailiwick. EPA said, this rule will not cause harm. We do not believe the technology changes it will prompt at those facilities not already in compliance will be harmful. And was that based on the services' advice or — or comments? No. But the — the services do not dictate the agency's characterization of the scope of its own action. Why should we — I'm new to this, and you're, of course, you're all expert in these matters. So why does it matter? Why should we be concerned? What's the big deal here? What's the big deal? Well, at the end of the day, the big deal here is EPA's rule. And EPA added to that rule provisions that are unlawful that exceed its authority. Let me put it another way. The EPA, in classic administrative law fashion, asks for comments by the world at large. And these people seem to — the services seem to me to be more relevant than the proverbial man in the street who also would be able to submit comments. So I ask you again, what's the problem with having sought their views? Well, the — the agency initially is required to say, will this have — my rule have any effect? Of course they're going to seek their views. But the only basis for the changes that EPA made after the end of the comment period is the service's view. And if that view is wrong, then there is no record for this rule. So they have a right to comment, but not a right to have any effect on the rule? They have a right to comment, but they — but the ESA does not create new This is EPA's rule. EPA has to follow the appropriate procedures. I'm going to go back to my initial question. You just say — you just said, nor does the — nor do the services dictate. And yet, we're — I think, in answer to my question, you've acknowledged that they're not dictating anything to the EPA, which has reserved discretion to say no and to refuse to adopt the recommendations of these services. Let me put it a slightly different way. First, this is EPA's rule. The basis for the — any basis for that rule must be — must — the provisions and the underlying basis are subject to notice and comment. EPA did not provide notice and comment for either these new provisions or their basis. Yes, EPA could have rejected them, but at the end of the day, this is EPA's rule, and it must supply the authority. And what EPA did here was point to the biological opinion and say, the devil made me do it. I included these because the services told me to. Is there any — you mentioned notice and comment, I guess, about the services' recommendations? During the course of the public comment, the agency did not even intend or anticipate that they would have to undertake formal consultation. In the course of the rulemaking proceeding as a whole, they never mentioned the services, consultation, or anything else that might change. Let me ask you then, is there an independent right to comment on the consultations conducted under the ESA? We are not saying that there is such a right. So what is it that you're saying? We are saying that when an action agency, EPA, adopts a rule, it is responsible for providing notice and an opportunity for comment on the basis — on the rule and the basis for that rule. And these new provisions — I'm not sure of that with the fact that there's no independent right to have public comment on the consultations. Because you're not commenting on the consultation. You're commenting on the basis for the rule. There's nothing in the ESA that says, if the services dictate what happens, and EPA — EPA could completely change the rule at the end of the day. But yours is a prescription for a never-ending administrative process. If the agency takes the advice of a particular commenter and that is reflected in the rule that it adopts, you're asking the agency to still again have another — have another period of comment on its — on its — on its projected rule. Not at all. When does it end? Well, first of all, if the agency — if the — if the services had done what they — what the law required them to do here, they would have said, these technologies will not cause harm or prevent the use of better technologies. We're done. And if they had done that, there would have been no question. There would have been no issue. But second — Now, did no one ever make such public statements or during the comment period? Was that something that came out of the blue when — when — when the — the final rule came out? What I'm saying? Yeah, no, I — I think I understand your question. The services have never any — identified any way in which the fish protection technologies these standards anticipate will be harmful. There's nothing in the biological opinion, which is their complete statement of what they looked at, that says this rule will cause new harm. Nothing. EPA never said, here's our proposed rule, but by the way, it might change when we go ask the services what we should do and what our legal authority is. Never said a word. Didn't anticipate consultation. Never identified any possibility. None. We have your argument. Yes. Thank you so much, Your Honor. Good morning, Your Honors. My name is Reed Super, representing the environmental petitioners. My colleague, Don Rotenberg, is at council table. I will address the Clean Water Act in four minutes, and he's going to have, with the Court's permission, three minutes to address the Endangered Species Act. To address what? The Endangered Species Act. The ESA. The ESA. Yes, Your Honors. Okay, go ahead. Section 316B requires EPA to establish standards, and those standards must require cooling water intake structures to reflect the best technology available for minimizing adverse environmental impact, BTA for short. We contend that EPA violated that statutory mandate with respect to both impingement and entrainment. For entrainment, the rule tells permit writers to consider an open-ended set of factors, giving those factors whatever weight he or she chooses, and then to establish site-specific requirements that reflect what the permit writer believes is warranted, the level of entrainment reduction that the permit... Let me ask you, just so that I understand the legal terrain and your options on the environmental side. There is a possibility on the... Well, you're on the CWA. Maybe I'll ask your colleague this, but it has to do with the citizen supervisions and your ability subsequently to, on a site-specific basis, sue to stop the grant of a permit. If Your Honour is OK with asking my colleague, and I'll continue clean water. Thank you. Go ahead. But now he's on notice. The entrainment provision I just referred to is a far cry from the standard that Congress required. That's our Chevron argument. We also have a State Farm argument. On the record before EPA, we contend that there is not a rational connection between the facts found and the decision made, nor a reasoned explanation. Here's what EPA found. Closed-cycle cooling is indisputably the most effective technology, reducing impacts by 95%. And the most expensive. And perhaps the most expensive. But EPA did not reject closed-cycle cooling, it says this in the record, as a national BTA technology based on cost, meaning either economic achievability, affordability, or cost benefit. EPA also- It's not ideal, but I take it that they said that there was a issue with availability. Land availability and so on. They said that of the 1,065 facilities, approximately a quarter would not be able to install closed-cycle cooling, which means that 75%, three quarters, 800 facilities could. That left EPA with the ability to do a number of things. Set a national standard with variances, which they sometimes call an off-ramp, or even leave it site-specific, and make closed-cycle cooling the BTA, presumptive BTA, subject to a determination at the local level. Well, it did that with new units. With new units, correct. EPA set the national performance standard based on closed-cycle cooling with variances. So for the long term, assuming that a number of these old units are gonna have to be refurbished and become new units, then you'll get closer to the ideal of 95%. What's arbitrary and capricious about that decision? Well, EPA didn't do that. For existing facilities, EPA said, as I mentioned a minute ago, that the level of entrainment reduction is whatever the permit writer thinks is warranted, based on an open-ended set of factors. What EPA, a rational basis would have been, with 75% of the facilities able to install, that's 800 facilities, install closed-cycle cooling, you'd have a result where, after the site-specific implementation, roughly 800, give or take, would install closed-cycle cooling. Here, EPA says, I have no ability at all to predict decision-making by the permit writer. Let me give you an example. One of the factors that EPA- Then is the, you're not saying that the permit writer has unreviewable authority to decide what ought to be installed? It's very close to that because the permit writer- But it's not. It's, I don't know if you mean by very close. That's a characterization. What limitations exist on the ability of the permit writer to do something irresponsible? Well, the rule can't, the permit writer can consider any factors he or she wants. One of the factors that EPA listed that they may consider is retirements, is flow reduction associated with retirements of a unit at a facility within the 10 years prior to the effective date of the rule. So when a permit writer makes a decision, say five years from now, a unit that was retired 15 years earlier could be given controlling weight because the weight is in the discretion of the permit writer, could give controlling weight and require no technologies at all at the units that are gonna continue operating, totally disregarding not only closed cycle cooling- Are those the units that will continue operating but will go offline? No, no. Really, so? No, no. The units that will continue operating for 50 years, say, would not have to do anything to comply with this rule if the permit writer gave controlling weight, because a permit writer can give any weight he or she wants, to the units that retired 10 years before the effective date of the rule by the time a decision is made on a permit under this rule that may be 15 years ago and- I hate to tell you, but I've been working on this case till my head spins and I'm not sure I understand where I would find the point you have just made. The point that EPA didn't get the State Farm argument? Well, that based on what happened 10 years earlier, a permit writer can allow a facility to operate for the next 50 years without any measures taken. Oh, it's right in the rule. It's right in the rule. It's 1-25-98-F. And F2 says the weight given to each factor is within the director's discretion. F3 lists six voluntary factors. One of them is the credit for flow associated with the retirement of units in the 10-year period preceding the effective date of the rule. You're saying that a, so you're anticipating that a permit writer will only look at one of these six non-exclusive factors? No, I- And govern what the permit writer does entirely by that. EPA specifically said the permit writer may give whatever weight he or she wants within his discretion. So I'm assuming the permit writer will consider the five mandatory factors, consider some or all of the six voluntary factors, consider any other factor he chooses because he's been given that authority, and give them any weight. This could be given controlling weight or just the preponderance could be given a little more weight than anything else and require nothing else. Thank you. Thank you. Good morning, your honors, and may it please the court. My name is Edan Rotenberg and I also represent the environmental petitioners on the ESA issues. And I think I'm actually under two pending questions. And the first is actually Judge Cabronis' which is what's the big deal here? And the big deal is that cooling water intakes kill staggering numbers of endangered animals every year. And many of those species are rapidly moving towards extinction. That's not me, that's the record. These impacts have never been analyzed before under section seven of the ESA. And for the most part, they won't be in the future. So it was vital that the government consult properly here. They didn't and that consultation was unlawful for two different reasons. And Judge Loy, I'll get to your question in just a second. The first reason is that the services did not complete and are never going to complete a detailed analysis of the effects of the entire action on listed species. And that's again, right out of the statute 7B, that is what their duty. As a result, the biop, the biological opinion and the incidental take statement are missing many basic legally required elements. So Your Honor, to your question, could we go around and bring citizen suits at 1,065 plants with enough time maybe and a lot of luck? But that's not really the question because Congress didn't ask citizens to fill in for the EPA. Congress put a statutory duty on the government to ensure against jeopardy and to do so by completing a detailed analysis and a biological opinion, which then provides the basis to write a detailed incidental take statement and they didn't do that here. So what is it that in your view the EPA should have done? How should it have proceeded in a way that you would not at this point regard as satisfactory compared to what it did do? The easiest answer to that is the services should have called jeopardy, which is what they did originally. Should have what? Should have called jeopardy on this rule. And that would start the process. That doesn't kill the rule. That doesn't kill the process. That starts the process of setting out reasonable and prudent alternatives, a reasonable and better version of the rule that meets EPA's statutory mandate and simultaneously protects endangered species. That outcome was entirely possible. It was not explored on this record. And I want to make a point in response to what Ms. Bullock said. So you don't think that these process-based protections that it relied on and that the EPA relied on are legally sufficient? Absolutely not, Your Honor. And that's the second major problem here, that even if the biop and the incidental take statement were not facially deficient, missing many required components, don't meet the statutory requirements, even if none of that were true, even if that wasn't a problem, the no jeopardy conclusion depends, as you said, on this process. It's not binding. It's not part of the rule. It's not reasonably certain to occur. No government agency has actually made any binding commitment to it. Every court that has encountered this. If the services were to, I mean, they rely on the word expectations and so on, I understand that. But if the services together with the EPA, the government, as shorthand, were to say that this was not just an expectation, but a commitment by the services, would that be enough? That wouldn't be enough, but that would definitely be a great start. But why wouldn't that be enough? Again, because the requirement of the Endangered Species Act is to consult in advance of action to make sure that the entire government action is not going to endanger species. So what they would have had to do is the kind of thing that other courts have allowed, where there's a comprehensive analysis up front, a comprehensive biological opinion, with or without an instance. That's what you're asking for when you use the words comprehensive. I use the word ideal. And this is for both sides. Is for a standard that is not really the standard that we are looking at. We're looking to determine whether there's a rational relationship, whether the acts and the decisions of the EPA and the services are arbitrary and capricious. That's a very low standard. You're right, that is a very low standard, but that's not the only standard that applies here. Your Honor, you hit the nail right on the head. It's the difference between comprehensive and ideal. In other words, they're not expected to do the ideal. They're not expected to do what's perfect. But what section seven of the ESA requires, section 7A says, use the best available data to do the best job you reasonably can. Now, the National Marine Fisheries Service made a good attempt at that. If you look at appendices B and C of the biop, that's what that looks like. They took a look at the current status of all the species affected. You're making the argument, as I understand it, that was advanced by the Ninth Circuit, correct? Yes. We're dealing with the same, and is there a, well, it has to do with whether the impacts analysis can be deferred to a project-specific review later. Am I correct? If I'm not, tell me. No, no, Your Honor, you're right. This is complicated stuff, and I don't claim expertise. The number of times? The EPA does, but I don't. Yeah, it's very difficult to wrap your head around for me. Hopefully, you'll have better luck with it, but. Explain it to me. Okay. What other courts have allowed, and what makes sense, is that there's a comprehensive analysis up front, meaning the government actually has a decent understanding, the best understanding they can develop of what's actually gonna happen to different species under the rule, and then if. On a site-specific basis. No, they start up front with some understanding. They use that to guide the future site-specific. Right, yes. And some understanding is not what you need. That's been done, but the site-specific analysis has been deferred. That has been allowed only where there is competent understanding up front, correct? Oh, yes, certainly, but you have to have both parts. The predicate must be a comprehensive, whatever that means, analysis with as much information as the government can gather in connection with the ultimate findings, right? Yes, the government has to do the best job it can reasonably do up front at the time. It doesn't have to be perfect, but you can see what that looked like in Appendices B and C of the biological opinion. That's what the International Fishery Service set out to do. Now, what courts have allowed is to defer the incidental take statement when no animals were going to actually be killed until those later stages. You can't do that here at all. You can't have that kind of deferral here at all, Your Honor, because the day this rule went effective, the day permits started to be issued under it, plants operating under those permits began taking listed species. So we're now in 2017. We have lost several hundred thousand endangered fish and animals under this rule. They have been taken under permits issued under this rule because permits turn over every year. And so that analysis had to be done before any animals die, essentially. The government is required to consult at the earliest possible time. Incidental take statements have to be issued before take occurs. Again, the ESA is written in a way that requires the government to understand the consequences of its actions up front to the best degree that it can to mitigate those actions up front and to set threat triggers for doing that, but it didn't do that here. You haven't. What specific language in the ESA's section seven are you relying on? The first and most fundamental is the duty to ensure against jeopardy. Following that is the duty to use the best available commercial and scientific data. What's that language really? In addition, you have the requirement in 7B3 to do a detailed analysis of the effects of the action on listed species. That doesn't mean a hand-waving exercise. That means to understand how many fish are gonna die, how many animals are gonna be taken, and what that means for the future of the species before you start making those kills. And that then has to lead to a written incidental take statement. That's section 7A4. And all of those are further fleshed out in the regulations. And how do we assess? Under what standard do we assess whether an analysis is sufficiently detailed? At the end of the day, it is essentially a state farm question. The statutory interpretation, you do have a Chevron issue, however, with this basic question of is there detailed analysis? And what does detailed analysis means? And you have a Chevron deference question to the services who have explained many times what detailed analysis means. So you have issues under both statutes. You have a Chevron issue with the need to ensure against jeopardy, with the need to use an incidental take statement that specifies take with the requirement for detailed analysis on the effects of listed species. That's all sort of Chevron one, and most Chevron two because the services have guidance and regulations on this and have subsequent to this rule issued further regulations on this. And then you get down to the next. Thank you. Perry Rosen from the Department of Justice. I'm going to split my argument. Ms. McNeil is going to address all of the endangered species issues raised by the ESA issues and the last environmental council. I want to address the issues raised by Mr. Super on the availability determination and the director's discretion. But you start out, you take a step back, and one thing in this case is absolutely clear from Riverkeeper one, quote, this court said, quote, we see no textual bar in section 306 or 360B to regulate any below threshold structures on a case-by-case basis. EPA's decision to regulate some aspects of cooling water intake structures on a site-specific basis is within its authority and reasonable, meaning it's within its statutory authority to treat these on a site-by-site basis. It's not arbitrary and capricious. Doing it on a site-specific basis, is that the same as doing it on a project-specific basis or at the time of the permitting? Essentially, it is. It's through the NPDES permitting process, yes. So that's how it's done to us on a site-specific basis. If you're going to do it through that process, you're really not going to have a comprehensive approach to this because, in fact, you're going to have a site-specific approach to it. Well, I guess it depends on what you mean by a comprehensive approach. You won't do it through one overarching requirement, but that's what the court Riverkeeper said is not required. You don't need. Yeah. OK. I mean, this is the court and Riverkeeper explain. You've explained what Riverkeeper says doesn't have to be, but what is the comprehensive? What is the comprehensive aspect of what has been done under this rule? The comprehensive aspect is that what's required in the rule, which is the best technology available to minimize environmental impacts, will be applied on a case-by-case basis using the best technology that's available at that site. So if closed-cycle cooling is the best available technology at that site, that is what will be required. It's comprehensive as to a site. Explain, just go back. Explain to me what comprehensive means. If that's a requirement. If it's not, then let me know that, too, if that's the government's position. But if it is, what exactly does comprehensive mean when what we have here is a deferral of review until in connection with a specific site at a specific time later in time? Comprehensive is not a requirement in the statute. There's nothing in the statute that requires some overarching comprehensive single requirement. The effluent requirements and the other requirements that go through NPDES permits are done on a site-by-site basis. And in particular, the circumstances for cooling water intake and how to address that are very specific to each site. It depends on the flow of the water. It depends on the type of the water. It depends on the species that are in danger in that particular area. And it depends on the cost issue. And cost was not a determination here. But cost is a key element of this. It's written into the regulations. And the director at each site is supposed to address the cost. And as EP has made clear, that's a very specific determination. If a closed cycle cooling facility costs about, let's say, $7 million, the director makes a determination. A director at one site may say, OK, that's going to cost $7 million. And it's going to save a billion aquatic resources species at that site. At another site, that same $7 million may save 200 aquatic sources, 200 fish. Well, that's a site-by-site cost determination that the Supreme Court said is allowed to be made and that EPA put into the regulations. Doesn't seem like you're taking any account of the fact that some of those creatures can become extinct. No, we are. No, we are. There are special regulations which are being challenged here by industry, for instance, that says they call for additional measures to be taken in the event that the best technology available at that site doesn't address the endangered species. And the director has to put in additional requirements. And if he doesn't, he has to explain, based on the data and the studies that are required under the regulations, to explain why he's not putting in the most effective technology. And that's the 60-day review period with the services? That comes at the beginning of that process. At the end of the process, when he issues the permit, if he doesn't choose what is the most effective technology that is actually available at that site, he must explain in writing, in detail, why he didn't do that and what mitigation measures were available to try and address that. And then EPA can say, no, we're going to veto that permit. We're going to federalize that permit. Is EPA reserves veto power in every one of those cases? Every one of those cases. And is that your response to the argument that, in practice and effect, the decision at each site is going to be made by the person who issues the permit? The person that issues, I'm sorry, the permit? Yes. Yes. Yes. That's exactly it. That's exactly it. Not on federal discretion. It is not on federal discretion. There are the five elements that the director is required to look at under the regulation. There are six more elements that EPA says the director may, in fact, look at. There is a whole host of data, information, and studies that the director has to look at and review. And then there are the requirements of the director that the final decision and what he puts in the permit must impose the best technology available to reduce those adverse impacts at that site. And at some sites, that will be what petitioners want, closed-cycle cooling. At other sites, it may not be for these different reasons. And finally, on the availability issue, great deference is to be accorded EPA on its determination of whether closed-cycle cooling was nationally available or not. But it's really a non-issue in this case. Because once you make the determination that a case-by-case, site-by-site analysis is OK, is permitted, there's nothing in the statute that requires EPA to first make a determination that the most effective technology is not available on a national basis. It made that determination. It's well-supported in the record. EPA gets the deference on that. But for instance, in Riverkeeper 1, this court said that dry cooling, which is 30 times more effective than the closed-cycle cooling that petitioners want here, was available. But EPA made a determination based on air pollution impacts and costs that it should not be implemented nationwide, even though it was the most effective and even though the court found it was available. The court said there are other factors to look at. Those need to be determined on a site-by-site basis. And that's exactly what this regulation does. Let me ask you, just to go back to one thing you said about the veto power, are there any concerns that these services might raise under their authority with EPA that EPA could not do anything about through the veto power or through its consultation or discussions with the directors throughout the country? I am not aware of any restriction on EPA from taking the actions through the veto power, requiring the actions necessary to address endangered species concerns raised by the services or by anybody else. So the EPA's authority under the Clean Water Act, at least with respect to these sorts of issues, is coterminous with the services authority under the ESA? Effectively, it is. It comes from two different sets. That's when you say effectively. Well, it comes from two different statutes. I understand that. There's nothing that requires EPA. So practically, you're saying, when you say effectively. Yes, and EPA has written that specifically into these regulations when it calls for not only the involvement of the services, but also on that other side, the director's side, to make sure he implements any additional measures that are necessary to address the impacts to endangered species. Mr. Rosen, if I understood what you were just commenting in response to Judge Laurier's questions, you were suggesting that your adversaries here essentially are raising issues prematurely, that these are issues which will not be determined with finality at this time by this sort of litigation. This is a facial challenge, so-called, right? And you're suggesting that until we get to the proverbial as-applied challenges, that's when these issues are ripe for adjudication. That is exactly right. And again, signing the Riverkeeper cases, that's what this Court said in several circumstances. And they even set out the language on the as-applied challenges and said, those are more appropriate for as-applied challenges. Petitioners can go in through a citizen suit at a particular site and say, no, director, you're wrong. You abused your discretion. Mr. Rotenberg tells me in answer to that hypothetical that it's thousands of facilities, and too many facilities. And it's frankly too late, because we've already lost or are in the process of losing all of these endangered species because of the existence of these facilities. Well, that's a matter for Congress, really. The effluent requirements, for instance, can be too late too. There's 70,000 facilities that require those permits. There's 1,000 facilities, 1,065 facilities that require the permits here for cooling water intake structures. Is it more cumbersome for the petitioners to try and object than if there's just one blanket rule and to see if that was imposed or not, rather than on the specific circumstances based on the water and the species and all the other factors at a specific site? Sure, it's more cumbersome. That's a matter for Congress to fix here. Congress created the Clean Water Act with cooperative federalism saying, EPA, set these standards and basic requirements, and then give the leeway to the states through these directors, through NPDES permits, to apply them to the specifics of that particular site. Where they place the intake structure has a big factor. The seasonal changes have a big factor. So you would otherwise be regulating with the proverbial acts instead of the scalpel. And the Clean Water Act provides for the scalpel type of regulation. Thank you. Thank you. Good morning, your honors. May it please the court. Bridget Kennedy McNeil, also representing EPA and the services. I would like to address the questions and arguments about the ESA specifically. I would start with the industry petitioner's arguments, if that's acceptable, and then address the environmental petitioners. Now, with respect to industry's arguments that the services improperly included future intake operations as effects of the rule, there's some confusion about the baseline and the service assessment of what is currently happening, past or current intake structure operations, and then the future. The baseline is a snapshot. You see that a lot in the case law. What's currently going on, what industry petitioners can't do, and the argument doesn't support them is somehow grandfathering in current operations, the baseline does not progress into the future. They're not ongoing operations. They are, it's a current snapshot. And these future operations will be under new permits that apply the standards of the rule. And the services, therefore, recently found that those operations are indirect effects of EPA's standard setting rule. Yes. Now, Ms. Bullitt was discussing whether the services improperly told EPA what the rule was. And I think that there is a balance here that Section 7A2 consultation goes right to. EPA, as the action agency proposes the action, it will take, and in consultation with the services, look at the entire effects of that rule. It is the services' expertise that they provide to EPA to determine the scope of the effects, not that the services came in and said, this is what your rule actually is, or this is how you need to change it. What they were doing is looking at the effects of the rule and the indirect effects. If you look at the regulatory definition, are those that are caused by the action that are later in time and reasonably certain to occur. They do not need to be later federal authorizations. They do not need to be later federal actions. You see in the consultation handbook put together by the services, which is in the record, discussion of later private actions, such as agricultural development that comes from a federal water contract. Private development later down the road, but still an indirect effect that is reasonably certain to occur and is attributable to the water renewal contracts. You have the Coleman case from the Fifth Circuit that also speaks to that point. Are the services legally committed to undertake this technical assistance project in connection with specific sites? The word expectations is what's used, but I'd like a representation from the government that it's actually a commitment, not just an expectation. I'd like whatever the answer is, but that seems to me to be problematic if it's not a commitment. The commitment is, as the services say, is have in every type of their administering the ESA. And here, as the BIOP lays out... What does that mean? That the agencies will... Sorry, generally, you have the services advise and give their opinion and shape the opinion and the ITS, if necessary. I'm not hearing the word commitment. Yes, the BIOP lays out the process and the rule lays out the process that the permit writers will transmit the permit, along with all the application information to the services. The services will provide and raise any concerns, any recommended measures. There will be this iterative back and forth that will also build a record, I think, going to some of your other questions. So you're telling me that the services are committed to engage in this back and forth, this consultation, this technical assistance in connection with projects. Is that right? Yes, that is the biological opinion. It's the services' understanding and expectations and commitment of how this process will work. And to the environmental petitioner's argument that you need to have some kind of additional regulatory process, the regulations here do lay out a binding process. You have the application information requirements. You have studies that will be submitted. You have the ability of each facility to contact the service independently and obtain information on species that their facility impacts. Then you have the public comment process. You have the responsibility of the directors to address the services' comments. And finally, the memorandum of agreement is the commitment between the services and EPA on how they will resolve any outstanding issues with individual permits. What about Mr. Rottenberg's argument that the predicate must be a comprehensive scientific study? I'm glad you asked that because that really gets to the heart of a dispute between the environmental petitioners. Now, if you look at the statute, it does not anywhere require the type of quantitative assessment that petitioners would like to see here. 7B3 does provide the services with great discretion on how to conduct a biological opinion. It certainly does require a written statement detailing the impacts, as well as a summary of that information, an incidental take statement if applicable. But nowhere is this quantified type of assessment. I mean, make no mistake, and I think your earlier questions, when petitioners use the word comprehensive, what they want is the equivalent of a quantitative site-specific impact. The record here explains numerous times, A, why that information was not even available. Most of these permit programs are administered by the states and have been for many years. This information was not within EPA's possession. But the BIOB does look at all of the effects. Again, not quantified, but you have a 30-page assessment in the biological opinion that looks at the impacts of stressors like chemical discharge, temperature, flow alterations, impacts on prey species and food webs. That assessment is there, and just because the petitioners have found other- Here's my concern, or a concern. How do we assess when an agency like the EPA or the services say that there is not enough available information? You can really prolong that hypo where at a certain point the agency says there is no information, but here's our biological opinion. Here's the process that we're going to undertake without any information because that information is not available. Where does that end? There's got to be some level of comprehensiveness, for lack of a better term. The best available data standard does draw that distinction. It says that you don't have to prolong the consultation process to go out and do new studies, acquire new data. It's best available data, but here I think this gets to the discrepancy in what environmental petitioners are requesting and what is the action at issue here. EPA's action was the nationwide standard-setting rule that will be later applied through individual permits, and as my colleague was saying, that is a result of the cooperative federalism structure of the statute. There is no federal site-specific permit, and that's part of why these cases about the Ninth Circuit cases that you mentioned, you know, a programmatic analysis and then site-specific biological opinions, that's not the correct paradigm here. What the services and EPA did was to look at the entire impacts of the rule and harmonize the substantive obligation to avoid jeopardy, even through indirect effects of the standard-setting rule and the structure of the Clean Water Act that delegates, you know, the site-specific permits to the states by imposing this robust procedure on the applicants, the permit writers, expanding the time on the front end for the services to evaluate the permits and provide additional input. And to industry petitioners' point on that matter, these are not necessarily, you know, made out of whole cloth. There are the provisions that they challenge build on many existing procedures of the permit process. There was already a right, you know, for the services to comment and provide feedback. You had this interplay. There was, in fact, already authorization for permit directors to impose conditions to significant impacts to fish and wildlife. If the services object to a draft permit on ESA grounds, what is there to assure anybody that the EPA is going to choose to object, consistent with the services objection? So I think there are a few backstops, if that's the word I can use to answer your question. You have the commitment in the 2001 Memorandum of Agreement between EPA and the services that details how the agencies will work together, also with the permit director, to address these. You know, and it leaves a lot of room for those issues to be resolved before you need to get to the, what you were calling the veto stage. But there is that commitment there that EPA has reaffirmed. In the preamble of this rule, that if the permit will jeopardize a species or adversely modify critical habitat, EPA will use its authority to federalize that permit. Now, I think that the process itself is set up so that that will probably be a rare occurrence because before you get to that point, you'll have public comment. You'll have concerned citizens being able to write in and say, that's not sufficiently protective. You'll have, the services will have a second opportunity to say, you know, we recommended this measure. It's not here. You'll build an administrative record, which is challengeable to your question, not only in ESA citizenship provisions, but also in state court challenges to the individual permit. So you have some records there. And then finally, the ESA itself has a backstop because as you see in the biological opinion, the services say several times, these are the assumptions about how this process will work. And if it doesn't, that may be a trigger to reinitiate section seven consultation because the no jeopardy, no adverse modification conclusion is based on that process working as designed. So you have also that backstop in the ESA authority itself in the Ruby pipeline case, a center for biological diversity out of the ninth circuit. That is a case that stands for, if it's part of the proposed action, it's also enforceable under the ESA if it doesn't come to pass. Thank you. Thank you. We'll hear rebuttal. If the services had respected EPA's characterization of the scope of its action, the federal action, none of these issues that Council for Riverkeeper or the government have been debating would occur because the services have never identified any way in which the technologies that EPA identified as the basis for the standard are harmful. The services would then have agreed with EPA that the rule has no adverse effects. And there would be no question about an incidental take statement and whether or not the biological opinion is valid or goes far enough. It is absolutely the law and we agree that this rule cannot authorize take. Facilities, if they cause take, would have to go and get permission from the services. And at that point, the services can apply whatever requirements are necessary in order to ensure that the action doesn't cause take. That's the way the statutes are set up. It is only because the services insisted that this rule was a comprehensive plan for the federal management of the withdrawal of all cooling water that this issue even arises. And none of those issues are, none of the debate that Council for Riverkeeper and Council for the government are having would have arisen at all. What makes you say, I'm not sure that I understand this argument because I think, I take it that the argument is that the EPA let the services define the scope of the action. Essentially, yes, Your Honor, that's exactly what they did. They said, this is our action. Our charge. But the services didn't come in really until two years after the EPA had done its work. And this, how do you differentiate consultation with the services from services defining the scope of the action? I mean, you may be confusing those two things. Or I may be confusing this. Well, no, no, it's a perfectly legitimate question because the call and exchange that occurs between the two agencies is complicated. And you're right. The agency went through the entire rulemaking, closed the comment, and of course, there was interagency review on the proposed rule. But the agency went through the entire rulemaking, got to the end, closed the public comment period, and then went to the services in 2012 and said, we think our rule is protective and will not require anything new that would be anything other than beneficial. And the services at that point said, we think what 316B, what you're doing under 316B is authorizing the withdrawal of cooling water. And that's not what 316B allows. And it's not what the Clean Water Act allows. 101G prohibits EPA expressly from interpreting any provision of the statute from interfering in any way with the state's absolute right to allocate water amongst users. Thank you. Thank you, Your Honor. A few quick points. First, the services have not made any commitment anywhere in the record. And the 2001 MOA has not been implemented as it was intended in those last 16 years. Second, and relatedly, there are 1,000- Mr. O'Neill just outlined all of the areas where, and she represented that it was a commitment. If Your Honors read the record, read the biop, there's- Is there anything to prevent us from interpreting the language and these various sources as, in effect, a commitment by the services? Is there anything to prevent us from doing that? I think the plain language of the biop and the terms and conditions there make it pretty clear that they may. It's full of mays. There are really no shalls. So you are actually fighting the idea that a panel might want to interpret the language as a language, obligatory language. That's what you're fighting. Well, Congress said that you must insure against jeopardy. And to go from a may and an interpretation that it'll hopefully work to insuring jeopardy, we don't see how there's any way to- But you, just so that I understand, you are telling me on behalf of the environmental petitioners that we cannot interpret that language as obligatory. We do not believe you should. Thank you. Thank you all. We'll reserve.